**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

**AMENDED JUDGMENT**
**IN A CRIMINAL CASE**
**(For Offenses Committed on**
**or After November 1, 1987)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 2:98 CR 37** |
| | ) | **U.S.M. No. 05408-027** |
| **RALPH WAYNE ANGLE,** | ) | |
| **Defendant** | ) | **Edward F. Malone,** |
| | | **Attorney for Defendant** |

**THE DEFENDANT** was found guilty on Counts 1, 2 and 3 of the superseding indictment after a plea of not guilty.

Accordingly, the defendant is adjudicated guilty of the following offenses:

| Title & Section | Nature of Offense | Date Offenses Concluded | Count Nos. |
|---|---|---|---|
| Title 18, § 2252(a)(2) | Attempted Receipt of Child Pornography | 1997 | 1 |
| Title 18, § 2252(a)(4)(B) | Possession of Child Pornography | 1998 | 2 |
| Title 18, § 2422(b) | Soliciting a minor Via Internet | 1998 | 3 |

Defendant is sentenced as provided in pages 2 through 5 of this Judgment.

**IT IS FURTHER ORDERED** that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, mailing address, or material change in the defendant's economic circumstances until the total special assessment imposed by this judgment is fully paid.

Date of original judgment:
   September 20, 2001

April 24, 2008
Date of Imposition of Judgment

Reason for Amendment:
Correction of Sentence on
Remand (18 U.S.C. § 3742(f)(1) and (2))

/s/ James T. Moody
James T. Moody, Judge
United States District Court

April 24, 2008
Date Signed

**Defendant: Ralph Wayne Angle**                    **Amended  Judgment - Page 2**
**Cause No.:  2:98 CR 37**

## IMPRISONMENT

The defendant, Ralph Wayne Angle, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Three Hundred (300) months. This total term consists of terms of Three Hundred (300) months on Count 1 and terms of One Hundred Twenty (120) months on each of Counts 2 and 3, all to be served concurrently.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this Judgment.

_____
                                United States Marshal

By:_____
                                Deputy Marshal

**Defendant: Ralph Wayne Angle**                    **Amended Judgment - Page 3**
**Cause No.:  2:98 CR 37**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a total term of five (5) years. This total term consists of a term of five (5) years on Count 1 and a term of 3 years on each of Counts 2 and 3, all such terms to run concurrently.   Within 72 hours of release from the custody of the United States Bureau of Prisons, the defendant shall report to the probation office in the district to which the defendant is released.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release, the defendant shall not commit another federal, state or local crime, shall not illegally possess a controlled substance, shall refrain from any unlawful use of a controlled substance, shall submit to one drug test within 15 days of placement on supervised release and at least two periodic drug tests thereafter, as determined by the probation officer, shall cooperate in the collection of DNA as directed by the probation officer, and shall comply with the following standard conditions previously adopted by this Court:

1) The defendant shall not leave the judicial district or other specified geographic area without the permission of the Court or Probation Officer;

2) The defendant shall report to the Probation Office as directed by the Court or Probation Officer and shall submit a truthful and complete written report within the first five (5) days of each month;

3) The defendant shall answer truthfully all inquiries by the Probation Officer and follow the instructions of the Probation Officer;

4) The defendant shall support his dependents and meet other family responsibilities;

5) The defendant shall work regularly at a lawful occupation unless excused by the Probation Officer for schooling, training, or other acceptable reasons;

6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances except as prescribed by a physician;

8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the Probation Officer;

10) The defendant shall permit a Probation Officer to visit him at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the Probation Officer;

11) The defendant shall notify the Probation Officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

**Defendant: Ralph Wayne Angle**                           **Amended Judgment - Page 4**
**Cause No.:  2:98 CR 37**

12)   The defendant shall not enter into any agreement to act as an informer or a special
       agent of a law enforcement agency without the permission of the court;

13)   The defendant as directed by the Probation Officer, shall notify third parties of risks
       that may be occasioned by the defendant's criminal record or personal history or
       characteristics, and shall permit the Probation Officer to make such notifications and
       to confirm the defendant's compliance with such notification requirement;

14)   The defendant shall pay any special assessment imposed; and

15)   The defendant shall notify the probation officer of any material change in his
       economic circumstances that might affect his ability to pay any unpaid special
       assessment.

In addition, the defendant shall comply with the following special conditions:

1)   The defendant shall not possess a firearm, destructive device, or any other dangerous
      weapon;

2)   The defendant shall neither possess nor have under his control any matter that is
      pornographic or that depicts or describes sexually explicit conduct as defined by Title
      18 USC § 2256, or any matter depicting or describing sexual activity involving a
      person or persons 18 years old or younger;

3)   The defendant shall report the address where he will reside and any subsequent
      change of residence to the probation officer responsible for supervision, and shall
      register as a sex offender in any state where the defendant resides, is employed,
      carries on a vacation, or is a student;

4)   The defendant shall not have contact with children 18 years old or younger;

5)   The defendant shall participate in a sexual offender testing and evaluations to include
      psychological examinations, behavioral assessments and polygraph examinations.
      The defendant shall also enter and attend sex offender specific group and individual
      counseling at an approved outpatient treatment program, if warranted from the
      testing, evaluations and assessments. The defendant shall participate in a co-payment
      program to offset the cost of such treatments, testings, examinations, evaluations and
      assessments.  The co-payment amount is based on annual poverty guidelines
      established by the U. S. Department of Health and Human Services on a sliding scale
      basis.  The co-payment amount shall not exceed an amount determined by the
      probation officer's sliding scale for monthly co-payment;

6)   The defendant shall not have personal access to computer internet services and the
      probation officer shall have access to the defendant's personal computer to verify the
      same; and

7)   The defendant shall submit his person and any property, house, residence, vehicle,
      papers, computer, other electronic communication or data storage devices or media
      and effects to search at any time, with or without a warrant, by any law enforcement
      or probation officer with reasonable suspicion concerning a violation of a condition
      of supervision or unlawful conduct by the defendant.

**Defendant: Ralph Wayne Angle**                    **Amended Judgment - Page 5**
**Cause No.: 2:98 CR 37**

## FINE

The Court is imposing no fine because of defendant's inability to pay a fine.

## SPECIAL ASSESSMENT

The defendant must pay to the United States a total special assessment of $ 300.00 which shall be paid in full immediately to the Clerk of this Court.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **2:98 CR 37** |
| | ) | |
| **RALPH WAYNE ANGLE** | ) | |
| **Defendant** | ) | |

### COURT'S SENTENCING MEMORANDUM

Following defendant Ralph Wayne Angle's third appeal, this case has been remanded for a third resentencing. The purpose of this memorandum is to supplement the statement of reasons for imposing sentence, to comply with the directions in the Court of Appeals' mandate vacating defendant Angle's sentence, and to address additional issues that have arisen during this third resentencing.

The Hon. Judge Rudy Lozano originally sentenced Angle on September 3, 1999, departing upward from a then-mandatory United States Sentencing Guidelines (hereinafter, "guidelines" or "U.S.S.G.") range of 97-121 months to impose a term of imprisonment of 325 months. On appeal, the case was remanded for Judge Lozano to explain "how the degree of departure is linked to the structure of the sentencing guidelines." *United States v. Angle*, 234 F.3d 326, 344 (7th Cir. 2000) ("on remand, the court must offer an explanation for the extent of its departure in accordance with the procedures outlined above") (hereinafter, "*Angle I*").

At the resentencing in 2001, Judge Lozano again imposed a 325-month sentence. On appeal, the Court of Appeals again remanded for resentencing, because Judge Lozano

"did not follow the step-by-step process in imposing the upward departure or make reliability findings about the uncorroborated evidence" on which the departure was based. *United States v. Angle*, 315 F.3d 810, 813 (7th Cir. 2003) ("*Angle II*"). The uncorroborated evidence specifically mentioned as being of concern was that "Angle had sex with a fourteen-year-old boy in Georgia, possessed child pornography from Mexico, sent a Valentine's Day card to a child he met at a gym, took a shower with an unrelated twelve-year-old boy, and molested numerous children" including "his girlfriend's daughter, his niece and nephew, and children in Mexico." *Id*. at 812-13. Angle's sentence was again vacated, and pursuant to Circuit Rule 36, the case was assigned to the undersigned judge for "further proceedings consistent" with the opinion. *Id*. at 813.

On remand, the parties disagreed as to the scope of the remand. Defendant Angle argued that the government was no longer entitled to present additional evidence supporting a departure from the guidelines range, filed a motion seeking to bar the government from presenting any evidence, and urged the court to comply with the mandate and resentence Angle by reviewing the transcripts of, and evidence introduced at, the prior two sentencing hearings. The government took the opposite view, arguing that by vacating Angle's sentence and remanding to a different judge pursuant to Circuit Rule 36, the Court of Appeals intended for this court to start from scratch and conduct an entirely new sentencing hearing.

Applying Solomon's solution, the court resolved the debate by giving each party half of the baby: it allowed the government to present new evidence concerning

allegations of Angle's past conduct with, and molestation of,[1] other children, but only if that evidence, in the exercise of due diligence, had previously been unavailable. Adhering to that ruling, the only new evidence the government presented at Angle's second resentencing hearing in May 2004 was the testimony of Karen S., the subject of the allegation that Angle had molested his "girlfriend's daughter."

The parties then requested, and were granted, until August 2, 2004, to file post-hearing sentencing memoranda. However, on July 22, 2004, the parties filed an agreed motion requesting that they not be required to file their memoranda, and Angle not be resentenced, until after the Supreme Court reviewed the Court of Appeals' decision in a case that had just been decided on July 9: *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004). When the Court did, it struck the mandatory language found in 18 U.S.C. § 3553(b) thereby making the range called for by the guidelines one of the factors to be considered in crafting a sentence. *United States v. Booker*, 543 U.S. 220 (2005).

The court then strove to adhere to the Court of Appeals' mandate while at the same time following its understanding of *Booker*. Resentencing Angle in May 2005 in the post-*Booker* world in which "the concept of 'departures' has been rendered obsolete," *United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005), the court made what it thought were adequate reliability findings on the uncorroborated evidence, and explained why it thought that a sentence of 300 months was reasonable in light of all the relevant considerations under 18 U.S.C. § 3553.

---

[1] The words "molest" and "molestation" are used in this order in the lay sense. Some of the conduct described likely does not meet a legal definition of molestation.

Angle again appealed, resulting in this third resentencing. The Court of Appeals'
unpublished decision, *United States v. Angle*, 216 Fed. Appx. 557 (7th Cir. 2007) ("*Angle
III*"), explains that this court completely botched Angle's last resentencing. First (although
mentioned last *Angle III*), the court erred by preventing the government "on remand from
submitting additional evidence to support allegations that it has already made regarding
Angle's inappropriate conduct with children." 216 Fed. Appx. at 562. Second, the court
"did not adhere to the panel's instructions," and again failed "to make reliability findings
with respect to Angle's uncharged conduct." 216 Fed. Appx. at 560. Third and last, the
court improperly engaged in "double-counting" by using the evidence concerning Angle's
past conduct with children both to increase Angle's base offense level pursuant to
§ 2G2.2(b)(5),[2] and also to impose an above-range sentence, without explaining why the
same conduct justified both: "The district court may not use these incidents to support an
above-range sentence on remand unless it gives a detailed explanation of why it thinks
they were not sufficiently accounted for by the § 2G2.2(b)(5) adjustment." 216 Fed. Appx.
at 560, 561.

As a result, the Court of Appeals vacated Angle's sentence, and remanded "so the
district court can make proper reliability findings on the evidence it used to justify its
above-range sentence and explain why it believes Angle's past conduct with children

---

[2] As noted in defendant Angle's "Response to Government's November 2007 Sentencing
Memorandum" (DE # 285) at 2 n. 2, under the 1998 version of the guidelines, applicable for
reasons to be discussed in the text *infra*, the correct enumeration is § 2G2.2(b)(4). In the 2006
version of the guidelines it has become, without substantive change, § 2G2.2(b)(5). For ease of
reference and to be consistent with the parties' memoranda, this court's prior orders and the
opinion in *Angle III*, the court will use the "(b)(5)" reference herein.

justifies both a § 2G2.2(b)(5) adjustment and a sentence above the guidelines range." 216

Fed. Appx. at 562.

## I. Reliability Findings

First, the reliability findings. *Angle II* and *Angle III* together identify the evidence on

which this court needs to make reliability findings. In *Angle III* the Court of Appeals noted

that at Angle's last (second) resentencing:

> [T]he court again considered allegations that Angle molested his girlfriend's
> daughter, had sex with a teenage boy in Georgia, and pursued children at a
> gym in Indiana. The court also continued to rely on Angle's activities with
> Mexican children. Although the court no longer asserted that Angle had
> traveled to Mexico to have sex with children, it concluded that Angle had
> made videos of Mexican children performing sexual acts. The court did not
> explain why any of the evidence it considered was reliable and, with the
> exception of Karen S.'s testimony, no new evidence was presented to bolster
> any of these allegations of inappropriate contact with children.

*Angle III*, 216 Fed. Appx. at 560. In *Angle II*, the Court of Appeals expressed its concern

regarding uncorroborated allegations that Angle molested his niece and nephew, where

"[t]he only evidence offered regarding Angle's molestation of family members was a letter

from the wife of Angle's nephew." *Angle II*, 315 F.3d at 813.

As to Angle's "girlfriend's daughter"—that is, Karen S.—the Court of Appeals

explained in its second opinion vacating Angle's sentence that a statement in the

presentence investigation report that Angle had molested his girlfriend's daughter, with

nothing more, was uncorroborated evidence needing further reliability findings. *Angle II*,

315 F.3d at 813. In stating at Angle's last resentencing that there was reliable evidence that

Angle had molested Karen S., the undersigned did not rely on an uncorroborated

statement in the presentence investigation report. At the May 2004 resentencing hearing, the court heard testimony from the victim herself, Karen S., who was subject to cross-examination.

She clearly recalled the incident, which occurred in 1986 when she was ten. She was molested by her mother's boyfriend, who she knew was named Ralph Angle. She described his physical appearance at the time accurately. Her testimony, though emotional, was collected, detailed and plausible. There is simply no reason to think that she has a faulty recollection, is lying, or is describing a different Ralph Angle. In other words, she is a credible witness. It should be noted that, in his response to the government's sentencing memorandum, Angle fails to suggest any reason why her testimony is unreliable, and in fact, ignores this issue entirely. In the court's opinion, credible testimony from the victim herself concerning the incident in question is highly reliable evidence that the incident in fact occurred.

Cutting to the chase, similarly reliable evidence exists concerning allegations that Angle had sex with a teenage boy in Georgia, molested a niece and nephews, and pursued children at a gym in Indiana. At Angle's most recent sentencing hearing, held on November 5, 2007, the court heard testimony from several witnesses, including Tommy W., the alleged teenage victim in Georgia. The court summarizes Tommy's testimony briefly.

Tommy's father died when Tommy was nine, and Tommy was raised by a single mother. When Tommy was about 14, his mother's boyfriend, a man named Terry Wilcher,

started molesting Tommy. Wilcher shared Tommy sexually with other men, including one Tommy knew only as Butch, when Tommy was 15. Wilcher, Butch and Tommy stayed together at a Courtyard by Mariott. They watched pornography together, and Butch masturbated Tommy, fellated him, and penetrated Tommy's anus with his finger. Tommy refused Butch's request to "have sex"—presumably anal intercourse with Tommy on the receiving end—and Butch accepted Tommy's decision. In the courtroom, Tommy identified Angle as looking like the man he knew as Butch: "It looks like him. I'm not totally certain. It's been ten years." Transcript of November 2007 resentencing hearing (hereinafter, "third resentencing tr.") at 64.

Evidence introduced during Angle's trial and first two sentencings bolster this identification, as follows. Angle used "Butch 8003" as an alias on the internet, as shown by a transcript of a July 30, 1997, on-line chat between "Butch 8003" (Angle) and an individual Angle thought was a 13 year old boy. In it, Angle describes molesting a 15 year old named Tommy two weeks earlier. Transcript of September, 1998 trial at 62 and trial ex. 1-A . At the original sentencing hearing FBI agent Steven Sadowitz testified that Tommy was shown a photo array in June 1999, and selected a photo of Angle as the man he knew as Butch. September 3, 1999, sentencing hearing transcript at 34. Agent Sadowitz also testified that he went to the Courtyard by Marriot in Augusta, Georgia, and obtained registration records showing that Angle stayed there July 17-21, 1997. *Id*. at 37-38. Tommy would have been 15 years old at that time. Exhibit 4-B admitted at Angle's August, 2001, resentencing

before Judge Lozano, is a transcript of a 1997 conversation[3] between Angle and an undercover agent impersonating a 12 year old boy, in which Angle states that the last time he had "any sexual activity was with Tommy back in July." Transcript of August 2001 resentencing at 18-19.

As a result of Tommy W.'s credible testimony, corroborated by evidence that Angle was at a Courtyard by Mariott in Georgia at the time Tommy described, that Angle did use the nickname Butch, and Angle's statements in 1997 that he had sexual activity with a boy named Tommy in July, the court believes there is reliable evidence that Angle molested Tommy in Georgia when Tommy was 15.

At the November 2007 resentencing hearing the court also heard testimony from Angle's niece, Elizabeth B. She testified that when she was 11 or 12 years old she was living with her divorced mother in California. Third resentencing tr. at 12. Angle was also living in California, and came to visit one day. He took Elizabeth with him to his girlfriend's house to swim. They were in a Jacuzzi together, and Angle moved close to her and "tried to touch" her: "he tried to grab my leg, and then he went up between my legs." Third resentencing tr. at 12-13. She particularly remembers the incident, even though it occurred 24 years prior to her testimony, because when she told her mother about it immediately after it happened, her mother "told me I was lying – a lying bitch because he likes little boys." Third resentencing tr. at 13. It made her feel bad that her mother did not

---

[3] Agent Sadowitz described ex. 4-B as a transcript of an audio tape, but he and the questioner also referred to it as an "e-mail," which clearly it is not.  Transcript of August 2001 resentencing at 18-19.

believe her, and after that she never got along with her mother. Third resentencing tr. at 12, 15. The court finds that Elizabeth B. is a credible witness, and her testimony is reliable evidence that Angle attempted to molest her in the late 1980's when she was 11 or 12 years old.

At the 2007 resentencing hearing the court also heard testimony from John D. and Gerald D., Angle's nephews. Both testified that in the late 1970's, when John was 10 or 11 years old, and Gerald was about 9, they traveled from Indiana, where they lived, to Illinois to attend their great-grandmother's funeral in Bridgeport, Illinois. Third resentencing tr. at 18, 27. They spent the night in a hotel. John, who was the older of the two at the time, recalls that he stayed in the hotel sharing a room with his brother Gerald and their Uncle Ralph Angle.  Third resentencing tr. at 18. Gerald, who was "traumatized" by his great-grandmother's death, recalls sharing the room with his Uncle Ralph, and thinks that his brother John was also in the room but he is not sure of that. Third resentencing tr. at 26-27, 33.

John testified that during the night Angle got into bed with him and fondled his genitals, and wanted John to fondle his (Angle's) genitals. Third resentencing tr. at 19. Gerald testified that after he had gone to sleep, he was awakened by his uncle fondling his penis. Third resentencing tr. at 27. Angle then pulled down Gerald's pajama pants and tried to sodomize him. *Id.* Gerald "elbowed him, and he eventually left me alone." *Id.* He doesn't recall his brother—if his brother was there—being awakened by the struggle. Third resentencing tr. at 33.

John also testified about two incidents that occurred later involving Angle. When John was 12-14, he had surgery to correct hypospadias, a birth defect involving the location of the urethal opening on the penis. After the surgery, Angle asked to look at John's penis. Third resentencing tr. at 20. Later, when John was 15 and in a wedding party, he spent the night at his Aunt Diane's apartment in Valparaiso. *Id*. Angle was also there and, during the night, got into bed with him and touched his genitals. Third resentencing tr. at 21.

Angle does not address the latter two incidents involving John. However, he argues that the testimony of both men regarding the incidents that occurred on the night of their great-grandmother's funeral is not credible, because neither recalls the alleged molestation of the other. Angle believes that Gerald's testimony is particularly suspect because, although Gerald testified that he was very small and Angle was very large, he nevertheless was able to fight Angle off. Moreover, if there had been a "struggle" as Gerald describes, certainly John would have been aware of it.

The court disagrees with Angle's assessment. Young children can be sound sleepers, especially after a long and tiring day such as would occur when traveling to a different state and attending a great-grandmother's funeral. It is not surprising that neither remembers waking up when the other was being molested. There is another reason for the "struggle" not waking John, which makes it no more surprising that Gerald was able to fend Angle off. The "struggle" was perhaps quite mild, for any number of reasons. Angle may have relented so as not to awaken John, or he may have been afraid of causing Gerald

15

to cry out, alerting other guests in the hotel, or perhaps a vigorously struggling child was just not to Angle's perverted taste.

In the court's view, both John and Gerald were credible witnesses. Angle's acts occurred during an event that stands out in their memory, the night they spent in a hotel following their great-grandmother's funeral. Because the court does not believe that their recollections are faulty or that they are fabricating the incidents they described, their testimony provides reliable evidence that those incidents in fact occurred.

As to the allegations that Angle "pursued children at a gym in Indiana," *Angle III*, 216 Fed. Appx. at 560, at the 2007 resentencing hearing the court heard testimony from three witnesses, Marcy Crozier, Rosemary N. and Damian M. The court finds the testimony of these three witnesses credible and briefly summarizes it.

Marcy Crozier is, and was in 1996 during the incidents at issue, the general manager of the "Omni 41 Health and Fitness Connection" in Schererville, Indiana, which the court will refer to hereafter simply as "the gym." Third resentencing tr. at 35. Much of her testimony is based on hearsay. However, that hearsay consists largely of statements made to her by other employees of the gym in the course of their employment, or is corroborated by another witness's testimony, giving it some measure of reliability.

In February, 1996, Crozier investigated an anonymous complaint made by a member of the gym. Third resentencing tr. at 35-36. The member informed the gym's business manager (who is now deceased) that he was very concerned because another member had given his 15-year-old son a Valentine. Third resentencing tr. at 36. About two

weeks later Crozier was informed that the anonymous member, while at the gym,

approached the front desk and identified Angle as the member that had sent the Valentine,

and said that Angle had asked his son why he (Angle) hadn't heard from him (the son).

Third resentencing tr. at 37. The gym did nothing at that time. Third resentencing tr. at 38.

About a year later Crozier investigated a complaint made by another member,

Rosemary N.,[4] concerning her son. Third resentencing tr. at 40. Angle had approached her

son at the gym and asked him to come to his home to do yard work. *Id*. Because of

incidents that had occurred at Angle's home, Rosemary N. had filed a police report. *Id.* At

that time Crozier investigated the gym's records and determined that Angle visited the

gym the majority of the time during hours designated as "family time." Third resentencing

tr. at 41.

About four months later Crozier investigated another complaint that Angle had

asked a "young person" to come to his home. Third resentencing tr. at 42. As the result of

that complaint, Crozier called Angle and told him not to visit the gym during family time,

and that if there was another complaint, his membership would be terminated. *Id.* Crozier

was able to identify Angle in the courtroom. Third resentencing tr. at 39.

Rosemary N., a gym member, testified that during one of her visits to the gym with

her son, Damian, during family time, Damian came from the locker room with Angle.

Third resentencing tr. at 45-46. Angle made small talk, asking her if she was married, and

---

[4] In Crozier's testimony she refers to Rosemary N. as "Rose M." At the time, as explained by Rosemary N. during her testimony, her last name began with "M."Third resentencing tr. at 44.

telling her that he had met her son and that Damian was a nice boy. Third resentencing tr. at 46. Not long after that on another visit to the gym, Angle approached her and asked her if Damian could come to his home to do some yard work. *Id*. After Damian had done yard work on a few occasions, she became concerned because of a phone call Angle made to her home which her daughter had taken. Third resentencing tr. at 47-48. The daughter felt that Angle was yelling at her because Damian was not home. *Id*.

For that reason Rosemary monitored a telephone conversation between Damian and Angle when Angle called back that evening. Third resentencing tr. at 48. During the call Angle "kept questioning" Damian, asking him "[w]hy did you leave? You weren't supposed to go. I was supposed to pick you up." *Id*. Because of the tone of the call she pressed her son to tell her "what was going on." *Id*. Damian told her that Angle had been "touching his leg and doing the beat of the music." *Id*. Angle told Damian that he (Damian) should clean up before he went home by taking a shower, and that Angle would help him wash his back. *Id*. Rosemary reported the incident to the police but they told her they couldn't do anything because Angle "didn't actually touch" Damian's "privates." *Id*.

Rosemary's son, Damian M., testified that he visited the gym with his mother when he was 12 to 14 years old. Third resentencing tr. at 50. He identified Angle in the courtroom as the man who had approached him at the club, struck up a conversation, and asked him if he would be interested in doing some yard work. Third resentencing tr. at 50, 51. The first time he went to Angle's house to do the work, Angle came and picked him up. While they were returning to Angle's house, Angle was tapping his hand to the beat of

the music on the radio system, making contact with Damian's leg. Third resentencing tr. at

52-53. This made Damian uncomfortable, so he "scooted over." Third resentencing tr. at

53.

The second time he went to do work at Angle's house, his mother dropped him off.

When they were finished Angle suggested he clean up before going home by taking a

shower, and that he might need help washing his back." Third resentencing tr. at 54.

Damian said he would shower at home, and Angle then suggested they look at

pornography together on the internet. *Id*. While doing so, Angle asked him if he would

like to masturbate, and whether he liked giving or receiving massages. Damian declined

both suggestions. Third resentencing tr. at 55. Before Damian left, Angle suggested that he

might take him to Six Flags amusement park some time. Third resentencing tr. at 55-56.

Damian went back to Angle's house a third time to do work, but he took along a

friend and carried a pocketknife because he was worried about the things that had been

going on. Third resentencing tr. at 56-57. He returned despite that because he felt that

Angle was overpaying him for the work he was doing. Third resentencing tr. at 57.

Some time after that third trip to Angle's home, Damian's mother "confronted"

him, and he told her what had occurred. Third resentencing tr. at 57-58. He recalls that

they went to the police station immediately after he told her to report the incidents. Third

resentencing tr. at 58.

The testimony of Crozier, Rosemary N. and Damian M. is consistent and, viewed

together, each corroborates the other. The fact that Angle did use his visits to the gym to

19

successfully initiate contact with Damian M. outside the gym suggests that the other

incidents, which were reported to Crozier and investigated by her as an ordinary task of

her employment, did in fact occur. The court believes, therefore, that there is reliable

evidence that Angle pursued children at the gym.[5]

As to the "Mexico" evidence, the court concludes, similar to its conclusion at the

last resentencing, that the evidence shows that Angle made at least one video, while on a

trip to Mexico, of naked Hispanic children engaging in sexually explicit acts. The

government continues to insist that the evidence shows that Angle traveled to Mexico for

the purpose of engaging in sex acts with children, while Angle argues that he cannot be

punished for mere plans or intentions. In addition, Angle argues that merely possessing

child pornography acquired in Mexico does not support a § 2G2.2(b)(5) enhancement, as is

explained in the definitions found in the application notes to that section.[6]

Being involved in the production of child pornography[7] is an entirely different

matter, and reliable evidence supports the court's continued belief that Angle was

involved in the production of the videotape at issue, Trial ex. 12-C. First, before Angle left,

---

[5] The government asserts in its November 2007, sentencing memorandum at 15 that Crozier's testimony is corroborated by pages 3-4 of ex. 1-A from the September, 1998, trial, the text of an internet instant messaging session in which Angle "admits that he trolls the fitness club looking for victims." This is a broad and aggressive characterization, or mischaracterization, of the message. The exhibit does show, however, that Angle took a very unhealthy and lewd sexual interest in observing young boys at the gym.

[6] "'Sexual abuse or exploitation' does not include trafficking in material relating to the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2 (11/1/97) App. n. 1.

[7] The court notes that at trial Angle stipulated that the "Mexican tape," Trial ex. 12-C, contained "visual depictions of minor children engaged in sexually explicit conduct as defined by Title 18." Transcript of September, 1998, trial at 365-66.

he sent a series of e-mail messages to his pornography distributor concerning a request that a shipment (containing such appalling titles as "Children Sex" and "Asian Fuck Boy") be held so as not to arrive the week beginning January 18, 1998, because Angle would be out of town. In the e-mails Angle made statements such as:

> [1/10/98] Going to mexico to play with boys.   : )
> [1/14/1998] I'll be in Acapulco and I think you know what I'll be doing. HUMMMMMMMMMMMMMMMMMMMMMM.
> Having a ball!!!!!!!!!!!!!!!!!!! Have got boys lined up already and waiting for our arrival. Will be a dream come true

Trial ex. 7-I (capitalization, punctuation, and smiley-face emoticon as in original). The court agrees with the government's characterization of Angle's statement that he was going to "play with boys" that, given his history, the only logical conclusion is that "he is not referring to shooting hoops." November 2007 sentencing memorandum at 19. Adding weight to this conclusion is the fact that Angle's traveling companion was Terry Wilcher, the man who procured Tommy W. for Angle.

More importantly, the videotape in question that United States Customs agents seized from Angle upon his return from Mexico was not a full-sized VHS tape such as is commonly purchased at retail. Instead, it was one of three compact "VHS-C" cassettes, and in his luggage with them, Angle was carrying a VHS-C video camcorder. Transcript of September, 1998 trial at 251. The only logical conclusion–or at least, the logical conclusion that this court draws–is that Angle filmed the VHS-C cassette himself while in Mexico or, if he did not operate the camera himself, was involved in the filming. The court believes

that this is reliable evidence that Angle was involved in the production of at least one sexually explicit video of Hispanic children while in Mexico.

In addition to the evidence summarized above, and pursuant to the direction in *Angle III* that even in a limited remand for resentencing, the district court is "operating on a clean slate in the sense that it can consider *de novo* any open issues," which allows the government to submit "additional evidence to support allegations that it has already made regarding Angle's inappropriate conduct with children," *Angle III*, 216 Fed. Appx. at 562, at the November 2007 sentencing hearing Group Exhibit 1 was admitted, consisting of correspondence seized during a search of Angle's residence in February, 1998. The government primarily focuses on a letter dated April 26, 1992, in which the Angle states that by the time he was 24 years old, he had "molested 15 – 20 young men in age from 12 to 15."[8]

Although Angle did not object to the admission of this evidence, he does object to the court making any use of it. The letter is unsigned and Angle asserts there is no reliable evidence he authored it. The letter does not describe any of the dates or circumstances of the alleged incidents, other than indicating that some of the incidents started when the author was 12 years old. Last, because there is no information as to dates and circumstances, it is impossible to determine whether any such incidents actually occurred, or whether the author is simply boasting.

---

[8] The transcript of the November 2007 sentencing hearing states "between 50 and 25 men." Tr. at 75. It is unclear whether this is a mistranscription or if the witness reading from the exhibit misspoke.

As to the authorship of the letter, there is reliable evidence that it was Angle. The letter was in a file, in a desk drawer, in a portion of the house occupied solely by Angle. (Angle lived in the house with his mother.) Other items in the file, including bills and receipts, are addressed to Angle or contain his signature. Other unsigned correspondence in the file contains internal references showing Angle to be the author, such as mentioning his first wife by name, and that he had molested his 13-year-old nephew in 1985. Angle was arrested in 1985 for molesting his nephew. Sentencing tr. at 72-75.

Angle's other argument fares better. It is difficult to conclude that the letter reliably proves that Angle in fact molested 15-20 children by the time he was 24. It is not unfair to give some credence to Angle's own words, however, and the letter does serve as evidence that Angle has engaged in some additional acts of molestation which are unknown.

## II. Explanation why the incidents summarized above are not sufficiently accounted for by the § 2G2.2(b)(5) adjustment and so do support an above-range sentence

The court's explanation why Angle's past conduct supports both a § 2G2.2(b)(5) adjustment and a sentence above the guidelines range is contained in the discussion that follows concerning which version of the guidelines governs this resentencing. When the United States Probation Office submitted its updated Revised Presentence Investigation Report to this court to assist it in resentencing Angle, it provided alternate calculations of his guidelines range: one using the 1998 version of the guidelines, as applicable at his first sentencing in 1999 before Judge Lozano, and one using the 2006 guidelines, as in effect at the time probation prepared the Revised Presentence Investigation Report. The reason for this latter calculation given by Probation in the Revised Presentence Investigation Report

is that the court, after *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), may consider information embodied in a new guideline when determining an appropriate sentence pursuant to the factors in 18 U.S.C. § 3553(a).

Under the 1998 version of the guidelines, Angle ends up with a total offense level of 29, which, with his criminal history category of II, results in an advisory guidelines sentencing range of 97 to 121 months. Under the 2006 guidelines, Angle ends up with a total offense level of 42, which results in an advisory guidelines sentencing range of 360 months to life for his criminal history category. The reasons for this staggering difference will be discussed below. The government takes the position that, not only should the court consider the new guidelines, it *must* apply them[9] when resentencing Angle. Angle, not surprisingly, takes a contrary view. He argues that not only must the court use the 1998 guidelines in its consideration of the § 3553(a) factors, to give the 2006 guidelines any consideration at all would be unfair.

The parties' contrary positions on which version of the guidelines applies begin with 18 U.S.C. § 3742(g)(1), which states as pertinent here:

> A district court to which a case is remanded . . . shall resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals, except that—
>> (1) In determining the range referred to in subsection 3553(a)(4), the court shall apply the guidelines . . . that were in

---

[9] As is explained in the accompanying text *infra*, the government's argument for mandatory application of the new guidelines is actually directed to the version in effect at Angle's last sentencing on May 5, 2005. The last amendment to the guidelines section at issue in this case, U.S.S.G. § 2G2.2, took effect on November 1, 2004. Thus, the current version of § 2G2.2 is the version in effect at the date of Angle's last sentencing.

> effect on the date of the previous sentencing of the defendant
> prior to the appeal[.]

The government simply asks the court to apply this language as written. On the date of

Angle's "previous sentencing . . . prior to the appeal"—May 5, 2005—the 2004 version of

§ 2G2.1 of the guidelines was in effect, which, as is noted *supra* n. 9, has not been amended

since and is the version used in the Revised Presentence Investigation Report.

The words in a statute are to be given their plain meaning unless doing so would

lead to an absurd result, or frustrate the statutory scheme. *Gillespie v. Equifax Information*

*Services L.L.C.*, 484 F.3 938, 941 (7th Cir. 2007). The statutory scheme of 18 U.S.C. 3742(g)(1)

indicates that a resentencing should occur on the same playing field—with additional

instructions provided by the remand—as the original sentencing.

Unfortunately, as written, the drafters contemplated only one resentencing, and did

not envision the ratcheting-up to more recent versions of the guidelines which occurs in

cases where there are multiple remands for resentencing, such as the present, if the

language is applied literally. Thus, § 3742(g)(1) only makes sense if "date of the previous

sentencing of the defendant prior to the appeal" is read to mean "date of the *original*

sentencing of the defendant prior to the appeal."

The only decision on this issue found by the parties, cited by defendant, supports

this reading of the statute. *United States v. Bordon,* 421 F.3d 1202, 1207 (11th Cir. 2005)

(statute "requires that the Sentencing Guidelines in place at the Bordons' original

sentencing be applied on remand.  . . . Accordingly, the district court properly used the

1998 version of U.S.S.G. § 2G1.1 because that was the version of the Guidelines in effect on the date of the Bordons' previous sentencing, prior to their first and second appeals").

The government's second argument is that the *Demaree* case, as indicated by a footnote in *Angle III*, shows that this court should apply, or at least consider, the version of the guidelines that are currently in effect on the date that Angle is again resentenced. In Demaree the Court of Appeals held that sentencing a defendant based on a version of a guideline that took effect after the defendant's criminal act was committed does not violate the *ex post facto* clause. *Demaree*, 459 F.3d at 795. The footnote in *Angle III* on which the government relies states in pertinent part:

> Assuming no change in calculation, the Guidelines range for Mr. Angle's offenses under the current version of the Guidelines is substantially higher than the range that he has faced to this point. The government has advised us that Mr. Angle will be resentenced under the Guidelines currently in effect; after *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), *petition for cert. filed,* No. 06-8377 (U.S. Dec. 11, 2006), this would not offend the *ex post facto* clause.

216 Fed. Appx. at 559 n. 1.

No doubt this is true: applying the current version of the guidelines at this resentencing would not offend the *ex post facto* clause, but that constitutional principle has no bearing on the statutory issue presented by § 3742(g)(1). Not only was § 3742(g)'s application in a resentencing not before the court in *Demaree*, there is no indication that it was given any consideration in *Angle III*. The court thinks, therefore, that the footnote should be read as limited to what it says, and not given an expansive interpretation based on what it does not say.

The starting point, then, for the guidelines range to be used under § 3553(a)(4) in determining Angle's sentence is dictated by § 3742(g)(1), and is the version of the guidelines used at Angle's first sentencing, in September, 1999. That means that the 1998 version of the guidelines—the same version that was used by this court to sentence Angle in May, 2005—are used to calculate Angle's advisory guidelines range.[10] The question remains, however, whether the court should *consider* the more recent guidelines when resentencing Angle "in accordance with section 3553," 18 U.S.C. § 3742(g).

Answering that question begins by addressing the second instruction in the Court of Appeals' remand: explaining why Angle's past incidents with children "justifies both a § 2G2.2(b)(5) adjustment and a sentence above the guidelines range."*Angle III*, 216 Fed. Appx. at 562. Were it not for the specific instruction that the "district court may not use these incidents to support an above-range sentence on remand unless it gives a detailed explanation of why it thinks they were not sufficiently accounted for by the § 2G2.2(b)(5) adjustment," *Angle III*, 216 Fed. Appx. at 561, this court would have unfettered discretion to impose any reasonable sentence.[11] *Demaree*, 459 F.3d at 795 (district judge not even

---

[10] Whether the 1998 or current version of the guidelines is used, the government made a "supplemental" objection, on November 2, 2007, to the Revised Presentence Investigation Report's failure to include a four-level increase in Angle's base offense level under § 2G2.2(b)(3) (1998) (now § 2G2.2(b)(4)) on the basis of one photographic image seized from Angle and admitted at trial, which depicts three males urinating on a minor female's face. The court agrees with Angle that the objection is both untimely and raises an issue beyond the scope of the mandate. Therefore, the government's objection is overruled.

[11] In fact there would be one other limit on that discretion. 18 U.S.C. § 3742(g)(2) provides that on remand the court "shall not" impose a sentence outside the applicable guidelines range (determined by § 3742(g)(1)) except upon a ground that was included in the written statement of reasons required by § 3553 in connection with the previous sentencing, and which was held, in the remand, to be a permissible ground for departure. In this case the

permitted to presume that guidelines range provides correct sentence, and "his freedom to impose a reasonable sentence outside the range is unfettered.") Nevertheless, in spite of that discretion and the prohibition on assuming that a sentence within the guidelines range is reasonable, the remand accurately expresses the requirement that "a major departure should be supported by a more significant justification than a minor one," and that the district court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall v. United States*, — U.S. —, 128 S. Ct. 586, 597 (2007).[12]

The § 2G2.2(b)(5) adjustment applies by its terms if the defendant "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." The application notes to the 1998 version of the guidelines (when this was subsection(b)(4)) explained as they do now that a "pattern" is constituted by "two or more" instances of conduct, and that an upward departure may be warranted if the adjustment "does not adequately reflect the seriousness of the sexual abuse or exploitation involved." U.S.S.G. § 2G2.2(b)(4) (eff. 11/1/1997), App. n. 1, 2.

---

reasons given by the court for departure are all encompassed within the Court of Appeals' directive to give detailed reasoning why Angle's past conduct with children justifies a departure, making the two limitations one and the same. For that reason, the court need not consider the government's argument that § 3742(g)(2) is unconstitutional because it mandates a guidelines range sentence.

[12] It does appear, however, that *Gall* has put to rest the idea that a "World Series" departure must be supported by a "World Series" explanation, as held in *United States v. Wallace*, 458 F.3d 606, 614 (7th Cir. 2006), vacated and remanded for further consideration in light of *Gall*. *Wallace v. United States*, — U.S. —, 128 S. Ct. 856 (2008). In *Gall* the Court stated that a "rule requiring 'proportional' justifications for departures from the Guidelines range is not consistent with" *Booker*. *Gall*, 128 S. Ct. at 594.

Thus, a defendant who had engaged in only two instances of conduct involving sexual abuse or exploitation of a minor would receive the adjustment. Angle has had many more instances than two. The sheer number of those instances, which as this court noted in its prior written statement of reasons constitute a virtually unbroken 20-year pattern of conduct—and which this court believes will quickly resume upon Angle's release from incarceration—persuades this court that the adjustment does not adequately reflect the seriousness of the sexual abuse and exploitation involved, and that a sentence within the guidelines range would be neither reasonable nor appropriate in that it would not provide just punishment, and would fail to protect the public from further crimes by Angle.

In *United States v. McCaffrey*, 437 F.3d 684 (7th Cir. 2006), cited in the *Angle III* remand, the Court of Appeals observed that an upward adjustment is appropriate "where the defendant's history of abusive behavior is so extensive or so vicious that a five-level pattern enhancement is inadequate," and that "where the abuse was aggravated by McCaffrey's exploitation of the trust families placed in him as a clergyman, the district court was justified in its conclusion that a five-level pattern enhancement was insufficient." 437 F.3d at 689. Although the Court of Appeals observed in the *Angle III* remand that while "Angle was related to one of his victims, he is not comparable to a priest who uses his religious position to hide his activities," *Angle III*, 216 Fed. Appx. at 561, there is now reliable evidence that Angle abused his position of trust as a relative to abuse three other children, a niece and two nephews. In addition, the evidence indicates

29

that Angle targets and ingratiates himself with single mothers—his girlfriend in California, and Rosemary N. from the gym in Indiana, abusing any trust they may place in him to serve as a male role model for their children.

In *United States v. Griffith*, 344 F.3d 714 (7th Cir. 2003), also cited in the remand, an upward departure was affirmed because the district judge explained that, comparing the defendant to others he had seen in his years on the bench, the case was outside the heartland contemplated by the guidelines both because of the heinous nature of the pornographic photos involved and the risk that the defendant would continue to abuse children, based on his extensive past conduct.[13] 344 F.3d at 719.

The same is true here. Defendant Angle is not only a consumer of child pornography and a molester of children, his activities in Mexico indicate that he was involved in the *production* of child pornography, creating a new sexually-explicit video which he could trade with other "collectors" and purveyors of such destructive material.[14]

In addition, the tone of the internet chat messages the court has reviewed which occurred between Angle and individuals he was targeting that he thought were minors, along with other internet messages and written correspondence in the record showing Angle's lack of remorse and boasting concerning his activities, convince the court that

---

[13] The court notes that in *Griffith*, the Court of Appeals cites *United States v. Tampico*, 297 F.3d 396 (5th Cir. 2002), as a case illustrating an appropriate departure because the § 2G2.2(b)(5) adjustment did not adequately reflect the seriousness of the offense as evidenced by the defendant's past history of abusing minors. *Griffith*, 344 at 719. The conduct described in *Tampico* appears no more lengthy or serious than Angle's history. *Tampico*, 297 F.3d at 402.

[14] Exhibit 7-I contains an e-mail message dated November 10, 2007, to Angle's pornography supplier in which he states: "In the past, wer [sic] were also talking about tapes to trade. Going to Acaupolo [sic] on January 18 to the 26th. To play!

Angle is one of the worst child predators this judge has seen in over twenty-five years on

the bench, and that Angle will resume his conduct when he is released. Although Angle,

during his interview in connection with preparation of the initial Presentence Investigation

Report, expressed an interest in receiving treatment, the report also indicates that during

his time in the community following his two prior convictions for sex offenses against

children, he did not participate in any type of structured treatment program for sex

offenders.

Finally, in determining whether the sentence suggested by the advisory guidelines

range or one outside that range is a reasonable sentence, it is impossible to ignore the

perverse fact that, were Angle to be sentenced for the same conduct under the current

guidelines, his advisory range would be 360 months to life,[15] and the court would need to

explain why a sentence of less than 360 months is appropriate. As stated in *Demaree:*

> A judge who said he was persuaded by the insight that informed the new
> guideline to give a sentence within the range established by it could not be
> thought to be acting unreasonably. . . . A judge is certainly entitled to take
> advice from the Sentencing Commission.

*Demaree*, 459 F.3d at 795. See also *United States v. Sriram*, 482 F.3d 956, 961 (7th Cir. 2007)

(in case remanded for resentencing "current guidelines can be used to help guide a judge

who is minded to sentence the defendant outside the applicable guidelines range"); *United*

*States v. Johnson*, 427 F.3d 423, 427 (7th Cir. 2005) (current version of § 2G2.2 is "one

_____

[15] If the court had not adopted Angle's position on the government's supplemental
objection to the Revised Presentence Investigation Report, Angle's advisory guidelines sentence
would be life, exposing him to a statutory maximum sentence of 50 years based on his
convictions.

benchmark to gauge the reasonableness" of a sentence outside the advisory guideline range).

Under the current version of the guidelines, Angle's total offense level ends up at 42, 13 levels higher than under the 1998 guidelines. The huge increase results from the following changes to U.S.S.G. § 2G2.2. Under the current version, as the result of Amendment 664, which took effect November 1, 2004, Angle *starts* with a base offense level of 22, five levels higher than under 1998 version. Under the current version, as the result of Amendment 649, effective April 30, 2003, there is an increase for the number of sexually-explicit images involved, which, based on the evidence at trial of the number of images seized from Angle, would result in a four-level increase. Under the current version, as the result of Amendment 592, effective November 1, 2000, there is a five-level increase if the offense involved distribution in exchange for a thing of value, and there was evidence at trial that Angle intended to trade his child pornography for other child pornography, making this increase appropriate.[16]

Angle argues that considering the present guidelines would be inconsistent with the mandate, and unfair. Inconsistent with the mandate, according to Angle, because the 2006 guidelines are irrelevant to specific sentencing problems identified in the mandate. Angle's position is incorrect because 18 U.S.C. § 3742(g) requires that he be resentenced in accordance with § 3553, meaning that his sentence must in all respects be reasonable. As is

---

[16] The total of these adjustments is 14, but Angle's total offense level under the current guidelines is only 13 levels higher than in 1998. This is because under the Chapter D, Part 3 rules for calculating a total offense level when multiple counts are involved, Angle received an additional point under the 1998 version that he does not receive under the current version.

now clear, the wisdom embodied in the Sentencing Commission's amendments to § 2G2.2 should be considered in determining what is reasonable.

Angle argues that considering the present guidelines would be unfair, because it would "effectively punish him for successfully challenging the shortcomings of his prior sentencing hearings." Defendant's Response at 5.[17] That is only true if the 325-month sentence given twice previously to Angle by Judge Lozano and the 300-month sentence by this judge to Angle were unreasonable and substantively wrong, or wrong in some absolute sense, which the Court of Appeals has never stated.[18] In fact, the current version of the guidelines, which advise a minimum sentence for Angle of 360 months, indicates that Judge Lozano and the undersigned have been correct all along in believing that the 1998 guidelines range did not adequately reflect the seriousness of Angle's offenses, provide just punishment and adequately protect the public. To that point, *Johnson*, in addition to noting that current guidelines provide a benchmark for the reasonableness of a sentence, also observed that the amendments to § 2G2.2 "reflect the judgment of Congress that trafficking in child pornography was being punished too lightly." *Johnson*, 427 F.3d at 427.

---

[17] Angle cites three cases on the fairness issue, *United States v. Monti*, 477 F. Supp. 2d 943 (N.D. Ill. 2007); *United States v. Caputo*, 456 F. Supp. 2d at 970 (N.D. Ill. 2006); and *United States v. Black*, No. 05 CR 727 (N.D. Ill. 2005) (hearing transcript attached as ex. B to Angle's Response to Government's Nov. 2007 Sentencing Memorandum). The court has reviewed them and finds them inapposite.

[18] If the court were to give Angle a sentence greater than the 325 months that he initially received from Judge Lozano, that, although clearly a reasonable sentence under the current guidelines, would perhaps be unfair because his successful appeal would leave him worse off.

**CONCLUSION**

In light of the foregoing, after consideration of all of the factors in 18 U.S.C. § 3553 as directed by 18 U.S.C. § 3742(g), and following the directions in the resentencing mandate issued by the Court of Appeals, a sentence of 300 months is a reasonable and appropriate sentence for defendant Angle.

DATE: April 24, 2008

 S/ James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT